**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

LISA MARIE THOMAS,               )
                                 )
               Plaintiff,        )
                                 )          **CIVIL ACTION**
v.                               )
                                 )          **No. 17-2622-JWL**
NANCY A. BERRYHILL,              )
Acting Commissioner of Social Security,  )
                                 )
               Defendant.        )
_____)

**MEMORANDUM AND ORDER**

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security

(hereinafter Commissioner) denying Disability Insurance Benefits (DIB) pursuant to

sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423

(hereinafter the Act).  Finding no reversible error, the court ORDERS that judgment shall

be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the

Commissioner's final decision.

**I.      Background**

Plaintiff argues that the Administrative Law Judge (ALJ) failed to afford her a full

and fair hearing; that the residual functional capacity (RFC) assessed is not supported by

substantial evidence because the ALJ erroneously considered Plaintiff's allegations of

limitations, the testimony and other statements of her mother, and the medical source

opinions; and that he erred at step five because he erroneously accepted the vocational

expert (VE) testimony and limited Plaintiff to repetitive work, but assessed the ability to

perform jobs that are not identified in the DOT (Dictionary of Occupational Titles) as

repetitive jobs, and assessed the ability to perform a job requiring General Educational

Development (GED) reasoning level three despite limiting Plaintiff to simple work.  She

seeks remand "with directions to the Commissioner to grant her claims for disability

insurance benefits as she sustained her burden through step four of the sequential

evaluation process and the Commissioner did not sustain her burden at step five."  (Pl.

Br. 25).

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052

(10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he

findings of the Commissioner as to any fact, if supported by substantial evidence, shall be

conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual

findings are supported by substantial evidence in the record and whether he applied the

correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord,

White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than

a scintilla, but it is less than a preponderance; it is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Richardson v.

Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen,

862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that

of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting

Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988) (first brackets in Bowling, second and third brackets added)). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the

Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, considering the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court considers the issues presented here in the order they would be reached in applying the sequential evaluation process and finds no error in the ALJ's decision.

## II.    Full and Fair Hearing

Plaintiff argues that she was denied a full and fair hearing because the ALJ denied her request for postponement of the hearing to seek representation, did not give her the opportunity to question her mother who testified at the hearing, and did not give her the opportunity to cross-examine the VE at the hearing.  (Pl. Br. 16-17).  The Commissioner argues that Plaintiff received a full and fair hearing.  She points out that although the ALJ denied Plaintiff's written request to postpone the hearing, he stated he would reconsider

the matter at the hearing, and he did so. (Comm'r Br. 3). She argues that at the hearing the ALJ explained that Plaintiff had a right to representation at the hearing and gave Plaintiff the option of postponing the hearing to obtain counsel or to continue with the hearing without counsel, and he explained that if Plaintiff proceeded with the hearing and then changed her mind, he would adjourn the hearing and allow her to seek counsel before continuing with the hearing. (Comm'r Br. 3-4). The Commissioner argues that Plaintiff was given an opportunity to be heard at a meaningful time and in a meaningful manner, and was not prejudiced by not being affirmatively offered the opportunity to question her mother or the VE at the hearing. Id. at 5.

The court agrees with the Commissioner. Plaintiff applied for DIB on July 17, 2014 (R. 165), and was represented by an attorney at least by December 1, 2014 when she signed a fee agreement. (R. 107). Her attorney withdrew from representation on June 22, 2016 (R. 138), and the hearing notice was mailed on June 28, 2016. (R. 139). Plaintiff requested postponement of her hearing to find a new attorney and get ready for the hearing on July 19, 2016. (R. 160). The ALJ responded to Plaintiff's request on July 22, 2016 and did not find good cause to postpone the hearing, but stated that at the hearing he would "consider further reasons why the hearing should be postponed and scheduled for another date." (R. 161).

At the hearing, the ALJ noted that Plaintiff's representative had withdrawn at the end of June, explained Plaintiff's right to representation, the benefits of representation, and the maximum cost of representation, and asked, "Would you like to adjourn to get representative [sic], or would you like to proceed today without a representative?" (R.

5

36-37). Plaintiff then asked several questions regarding representation and the processes to be followed if the hearing proceeded or if the hearing were postponed, and the ALJ explained the processes. (R. 37-38). The ALJ explained, "It's completely your choice." Id. at 38. After further discussion of the processes and of the pros and cons, Plaintiff decided to proceed with the hearing, and the ALJ told her, "During the course of the hearing today if you change your mind, just let me know and we'll stop the hearing and you can go, all right?" Although the ALJ denied Plaintiff's pre-hearing request to postpone the hearing, he did not deny her the right to representation--she chose to proceed without representation.

The court finds no reversible error in the ALJ's failure to affirmatively ask Plaintiff to question her mother or the vocational expert at the hearing. While it is true that Social Security regulations, rulings, and policies provide that a claimant may present her case at the hearing, and may question or "cross-examine" witnesses at the hearing, and it would have been better if the ALJ had specifically done so, there is no such thing as "error per se" wherein an ALJ's decision must be reversed for every technical error. The Tenth Circuit has recognized that a court "cannot insist on technical perfection," but is guided instead by common sense in reviewing Social Security cases. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1166, 1167 (10th Cir. 2012); see also, Bowen v. Yuckert, 482 U.S. 137, 157 (1987) ("Perfection in processing millions of such claims annually is impossible") (O'Conner, J., concurring).

Plaintiff was not prejudiced by the alleged errors. The ALJ questioned Plaintiff's mother at the hearing regarding what she had seen of Plaintiff, not what Plaintiff had told

her.  (R. 59-64).  Before excusing her, he asked her if there was "[a]nything else you'd like me to know," regarding her daughter.  (R. 63).  He thanked her for testifying, released her to leave the hearing room, and told Plaintiff, "next let's take some testimony from the vocational expert."  (R. 64).  At no point did Plaintiff express any concern about this procedure or request to bring out further information from her mother.  Moreover, even now, with more than two years to reflect on the record or to question Plaintiff's mother, counsel does not suggest any testimony which could have been, but was not, presented by Plaintiff's mother, or any prejudice resulting from the failure to affirmatively ask Plaintiff to question her mother.

At the hearing, and after excusing Plaintiff's mother, the ALJ explained the purpose and procedure for questioning the VE, and concluded by asking Plaintiff to "sit back and just listen for a moment. When she's done testifying I'll come back to you and ask if there are other questions that you want me to ask her about limitations that you have."  (R. 65).  He had the VE testify regarding her resume and her experience, and asked if she had discussed her testimony with him or with Plaintiff before the hearing. Id. at 66.  He then asked her about past relevant work, and presented five hypothetical questions for the VE to answer, including missing work two days a month and being off task 20 percent of the workday due to impairments.  Id. 67-69.  Included within the hypothetical questioning was a discussion of the limiting effects of the abilities to handle and to finger bilaterally only occasionally--which resulted in the following exchange:

> [Q. (by the ALJ)]    Could such a person perform the claimant's past work?
> A. [(by the VE)]      No.

> Q. Are there other jobs in the regional or national economy that would allow a person to work with those limitations?
>
> A. Okay. When I limit that handle/finger, and then I limit the walking and standing to four hours, I'm really looking at a -- it would be a real specialized placement. I mean, I'd have to really --
>
> Q. It would be very difficult because most sedentary and light jobs require bilateral manual dexterity?
>
> A. Yes, there's 41 occupations that allow for -- that have occasional handle. Now, fingering isn't as significant in light work. There's about 750 that would have occasional fingering, but when I get down to those 41 occupations, then I limit the ability to stand and walk to four hours. I'm really looking at real specialized placements.
>
> Q. And the difficulty with interacting with the public, I assume, would further reduce those jobs?
>
> A. Absolutely, yes.
>
> Q. So, in fact, at that level are we basically no --
>
> A. We're pretty much -- the erosion of the base would be significant in terms of occupations.

(R. 68-69). Thereafter, the ALJ asked whether the VE's testimony was consistent with the <u>Dictionary of Occupational Titles</u>, and then turned his attention to the claimant: "Ms. Thomas, what happens next, I'm going to have my staff get those new records that we talked about" (R. 70), and he explained what would happen when he admitted records received after the hearing. <u>Id.</u> 70-71. He asked Plaintiff if there was "[a]nything else you want to tell me today before we close the hearing," and Plaintiff provided some additional testimony regarding her legs and her forgetfulness. <u>Id.</u> 71. Plaintiff did not ask to question the VE and did not indicate she had any issues with the procedure used. And, although counsel argues that the ALJ erroneously relied on the VE testimony, he does not suggest that Plaintiff desired to question the VE in this regard or that she would have addressed the alleged error. There is simply no indication that the hearing in this case was unfair or less than adequate beyond what a representative might have provided,

and Plaintiff waived having a representative at the hearing.  Plaintiff shows no prejudice from the ALJ's failure to ask her to question the VE.

## III.   Plaintiff's Allegations of Symptoms

Plaintiff begins a section of her Social Security Brief in which she alleges error in the ALJ's evaluation of her mother's testimony at the hearing and her mother's other statements in the record.  (Pl. Br. 17-21).  But, in the second paragraph of that section, she transitions to an argument that the ALJ erred in evaluating the consistency of her own allegations.  Id. 18-21.  An ALJ's assessment of a claimant's RFC is necessarily intertwined with his evaluation of the claimant's allegation of symptoms and with his evaluation of the opinion evidence in the record, both lay opinion and medical opinion.  Here, the court will begin by considering Plaintiff's allegations of error in the ALJ's evaluation of Plaintiff's symptoms, and in the next section it will address his evaluation of the opinion evidence.

### A.      The ALJ's Findings

The ALJ bifurcated his consideration of Plaintiff's allegations of symptoms.  First, he addressed her allegations about physical impairments (R. 15-17), and then about mental impairments.  (R. 18-19).  At the beginning of his consideration, he stated his finding that Plaintiff's

> medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons discussed below.

(R. 15).

He noted that the "mild to moderate objective imaging [of the lumbar spine in 2010] is inconsistent with severe radiating low back pain," id., "the mild to moderate abnormalities seen on objective imaging [of the cervical spine in 2011] is inconsistent with severe radiating neck pain," id. at 16, and that "[i]f the claimant's pain were as severe as alleged, it would be reasonable to assume the clinical signs and findings would be significantly limited, and she would require intensive medical treatment during periods of acute exacerbation. Therefore, the claimant's conservative treatment history and the mild to moderate clinical signs and findings suggest her symptoms are not of such a consistent and continuous nature that they would preclude all basic work[-]related activities." (R. 16). He noted that Plaintiff's abilities to "shop as needed, drive, perform basic household chores, including laundry, bake and mow the lawn using a riding tractor," and to live "alone every other week when her 15-year-old son stays with his father … is inconsistent with total physical disability." Id. He found that Plaintiff's physical impairments require an RFC for less than the full range of light work with limitations in postural abilities, manipulative abilities, and environments, but that Plaintiff's "subjective complaints do not warrant any additional limitations beyond those established in the residual functional capacity previously outlined in this decision." Id.

In relation to Plaintiff's mental impairments, the ALJ summarized notations of Plaintiff's primary care provider and the report of the psychological consultative examination provided by Dr. Schemmel and found that "the[se] clinical signs and findings are not consistent with more than moderate limitations in social functioning and [in] the ability to maintain concentration, persistence or pace." Id. at 17. He noted that

Plaintiff had no recent history of outpatient mental health treatment such as therapy or medication management by a psychiatrist, and no history of inpatient psychiatric treatment, and found that this "conservative treatment history is also inconsistent with disabling mental impairment, and her treatment history reveals no episodes of decompensation of extended duration." (R. 18). The ALJ noted Plaintiff's daily activities which require mental functioning and her report to Dr. Schemmel that she has no mental limitations in her ability to perform basic daily activities, and concluded that she "has no more than mild limitations in activities of daily living and no more than moderate limitations in social functioning and [in] the ability to maintain concentration, persistence or pace." Id. He noted that although Plaintiff's allegations are not fully consistent with the record evidence, they do require a reduction from an RFC for unlimited mental abilities, and explained that he "accounted for the claimant's moderate difficulties in maintaining concentration, persistence or pace by limiting her to simple, routine, repetitive tasks involving only simple, work-related decision with few, if any, workplace changes with no fast-moving assembly line-type work. Secondary to her moderate difficulties in social functioning, the claimant is limited to occasional interaction with the public." Id.

### B.     The Parties' Arguments

Plaintiff argues that "the ALJ has not given good reasons supported by substantial evidence for rejecting Plaintiff's allegations." (Pl. Br. 18). She argues the ALJ overstated Plaintiff's ability to perform activities of daily living because he did not recognize Plaintiff's report that she receives help from her parents, that she is limited in

the activities done, and her son helps her do those things.  Id.  She points out that "the performance of household tasks does not establish that a person is capable of engaging in substantial gainful activity." Id. at 19 (citing Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir. 1993)).

Plaintiff argues that different individuals may experience pain differently despite having the same impairments, and the same clinical signs and laboratory findings, and that spinal impairments cause disabling pain.  (Pl. Br. 19-21).  She argues that her work history, her employer's statements, and the opinions of her mother and her treating physician also support finding disability.  Id. at 21.  The Commissioner points to the ALJ's findings regarding Plaintiff's allegations and argues that the record evidence supports those findings.  (Comm'r Br. 6-9).

**C**        **Analysis**

The court begins with the ALJ's decision--the final decision of the Commissioner--and asks whether he applied the correct legal standard, and if the record evidence supports that decision.  The ALJ explained the legal standard applicable to evaluating a claimant's symptoms (R. 15), and Plaintiff does not argue error in that regard.

It is irrelevant if the record evidence will also support a different decision than that reached by the ALJ.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations,

quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

Plaintiff's argument that the ALJ overstated Plaintiff's daily activities fails, not because her daily activities demonstrate that she is able to perform substantial gainful activity, but because--as the ALJ found--those activities are "inconsistent with total physical disability" (R. 16), and suggest that "her symptoms are not of such a continuous and consistent nature that they would preclude all basic work activity." (R. 18). In other words, Plaintiff's daily activities, particularly her testimony that "she lives alone every other week when her 15-year-old son stays with his father," id. at 16, are inconsistent with her allegations that she is unable to perform even basic work activities, and when considered among several other reasons, justify discounting Plaintiff's allegations.

Plaintiff's argument based upon degenerative disc disease also fails. Plaintiff argues she has mild to moderate central canal stenosis in her low back which is a pain producing impairment and that the record contains a more recent MRI than that relied upon by the ALJ which showed her degenerative disease continues to progress. The ALJ acknowledged that Plaintiff's degenerative disc disease is a pain-producing impairment. The reason he was reviewing all the record evidence was to evaluate the degree of pain supported by that evidence because the mere presence of pain does not justify a finding of disability, but only pain so severe as to preclude all substantial gainful activity. Moreover, the reason the ALJ relied upon the 2011 MRI was that "the mild to moderate abnormalities seen on objective imaging is inconsistent with severe radiating neck pain." (R. 16). The findings of "shallow left paracentral protrusion and minimal uncinate

spurring with <u>minimal</u> left neural foraminal narrowing" (Pl. Br. 20) (emphases added) relied upon by Plaintiff, are merely another example of "the mild to moderate abnormalities seen on objective imaging" upon which the ALJ relied.  Plaintiff does not demonstrate that they are inconsistent with the ALJ's finding or that the ALJ erred in failing to specifically mention them also.  An ALJ is required to discuss only the evidence supporting his decision as well as uncontroverted evidence not relied upon, or significantly probative evidence rejected.  <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009-1010 (10th Cir. 1996).

Plaintiff also questions the ALJ's reliance on Plaintiff's "conservative treatment history" (R. 16), suggesting that Plaintiff's treatment history was not conservative because she had lumbar fusion surgery and "additional spinal procedure which did not resolve her lumbar spine issues," resulting in Dr. Bulger advising that she would either need to continue long-term medication management, undergo another traditional surgery, or consider spinal stimulation.  (Pl. Br. 20) (citing R. 459).  Plaintiff's argument ignores that the ALJ's decision considered the period from August 2013 (her alleged disability onset date) through November 25, 2016 (the decision date) and found that during <u>that</u> period her treatment history was conservative.  She ignores that her fusion surgery was in 2001, nearly twelve years before she alleges disability, and after which she worked for many years at substantial gainful activity levels.  (R. 450).

Plaintiff relies on Dr. Bulger's email to Plaintiff dated January 6, 2011, which contains a copy of Dr. Bulger's "note to Dr. Fisher."  (R. 459) (cited in Pl. Br. 20).  However, Dr. Bulger's email does not indicate when he performed the procedure

discussed or when he sent the note to Dr. Fisher. All we can know from that email is that the procedure was done before January 2011 and almost two years--or more--before the alleged disability onset date. Moreover, the email confirms that Plaintiff "has been doing" long-term medication management, and although it indicates Dr. Bulger was not sure Plaintiff was a surgical candidate, he explained that "maybe a new opinion and fresh point of view will be helpful." (R. 459). There is no indication Plaintiff was later referred for another opinion or for spinal stimulation. Finally, Plaintiff's argument ignores other findings of the ALJ, that "she refused any further instrumentation placement and would only consider decompression surgery as a possibility." (R. 16) (citing Ex. 16F/13 (R. 457)). Plaintiff has not shown that her treatment was in any way other than conservative, as found by the ALJ.

To the extent that Plaintiff argues there is record evidence which supports her allegations of symptoms, she has not shown error in the ALJ's findings, which are supported by the record evidence. And as discussed above, the fact that the record contains evidence which might also support, but does not require, a decision contrary to that of the ALJ is irrelevant to the court's review.

## IV.     The Opinion Evidence

Plaintiff argues that the ALJ erred in rejecting the opinion of her mother and in discounting the opinion of her former employer. (Pl. Br. 17-18, 21). She notes that the ALJ found Plaintiff had moderate difficulties maintaining social functioning and limited her to occasional interaction with the public, and argues that the ALJ consequently should have also limited her ability to interact with supervisors or co-workers. Id. at 21-22. She

also argues that the ALJ erred in discounting the opinion of Dr. Fisher and in relying on the opinion of Dr. Weis, arguing that the ALJ did not specify the inconsistencies in Dr. Fisher's opinion, erroneously rejected the opinion related to her dental condition, failed to address the regulatory factors for weighing medical opinions, and did not afford appropriate deference to the opinion as a treating source opinion.  Id. at 22-24.

The Commissioner argues that the ALJ appropriately considered and reasonably weighed the third-party opinions of Plaintiff's mother and of her former employer. (Comm'r Br. 9-10).  She argues that the ALJ reasonably considered and weighed the medical source opinions.  Specifically, she argues that Dr. Fisher's opinion that Plaintiff is disabled or unable to work is an opinion on an issue reserved to the Commissioner, that the record evidence supports the reasons given to discount Dr. Fisher's opinion, and that the ALJ properly accorded great weight to Dr. Weis's opinion.  (Comm'r Br. 11-12).  She argues that the ALJ appropriately weighed the opinions of Dr. Schemmel, the psychological consultant who examined Plaintiff, and of Dr. McRoberts, the state agency psychologist who reviewed the medical record, and that those opinions justify the ALJ's mental RFC assessment.  Id. at 13-14.

### A.     The Standard for Evaluating Opinion Evidence

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. § 404.1527(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the

Commissioner in accordance with factors contained in the regulations.  Id. § 404.1527(d);

SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2018).  A physician

or psychologist who has treated a patient frequently over an extended period (a treating

source)[1] is expected to have greater insight into the patient's medical condition, and her

opinion is generally entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762

(10th Cir. 2003).  But, "the opinion of an examining physician [(a nontreating source)]

who only saw the claimant once is not entitled to the sort of deferential treatment

accorded to a treating physician's opinion."  Id. at 763 (citing Reid v. Chater, 71 F.3d

372, 374 (10th Cir. 1995)).  However, opinions of nontreating sources are generally given

more weight than the opinions of nonexamining sources who have merely reviewed the

medical record.  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v.

Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407,

412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier

ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of

the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by

---

[1]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. § 404.1502.

"Nontreating source:"  an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.

"Nonexamining source:"  an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2); see also, Soc. Sec. Ruling (SSR) 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2018) ("Giving Controlling Weight to Treating Source Medical Opinions").

The Tenth Circuit has explained the nature of the inquiry regarding a treating source's medical opinion. Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (citing SSR 96-2p). The ALJ first determines "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" Id. at 1300 (quoting SSR 96-2p). If the opinion is well-supported, the ALJ must confirm that the opinion is also consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

If the treating source opinion is not given controlling weight, the inquiry does not end. Id. A treating source opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Id. Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or

contradict the opinion. <u>Id.</u> at 1301; 20 C.F.R. § 404.1527(d) (2-6); <u>see also</u> <u>Drapeau v.</u>

<u>Massanari</u>, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing <u>Goatcher v. Dep't of Health &</u>

<u>Human Servs.</u>, 52 F.3d 288, 290 (10th Cir. 1995)).

After considering the regulatory factors, the ALJ must give reasons in the decision

for the weight he gives the treating source opinion. <u>Id.</u> 350 F.3d at 1301. "Finally, if the

ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for

doing so." <u>Id.</u> (citing <u>Miller v. Chater</u>, 99 F.3d 972, 976 (10th Cir. 1996) (quoting <u>Frey</u>

<u>v. Bowen</u>, 816 F.2d 508, 513 (10th Cir. 1987)).

In the Tenth Circuit, an ALJ is not required to make specific, written findings

regarding each third-party opinion when the written decision reflects that the ALJ

considered that opinion. <u>Blea</u>, 466 F.3d at 914-15; <u>Adams v. Chater</u>, 93 F.3d 712, 715

(10th Cir. 1996). In <u>Adams</u>, the court "decline[d] claimant's invitation to adopt a rule

requiring an ALJ to make specific written findings of each witness's credibility,

particularly where the written decision reflects that the ALJ considered the testimony."

93 F.3d at 715. The <u>Adams</u> court determined "that the ALJ considered the testimony of

claimant's wife in making his decision because he <u>specifically referred to it in his written</u>

<u>opinion</u>," and the court found no error in the ALJ's failure to make specific, written

<u>findings</u> regarding the testimony. <u>Id.</u> (emphasis added). Ten years later, the Tenth

Circuit confirmed the rule that an ALJ is not required to make specific written findings

regarding third-party lay opinions if the written decision reflects that the ALJ considered

it. <u>Blea</u>, 466 F.3d at 915. The <u>Blea</u> court noted, however, that "[h]ere, the ALJ made no

mention of Mrs. Blea's testimony, nor did he refer to the substance of her testimony

anywhere in the written decision. Thus, it is not at all 'clear that the ALJ considered [Mrs. Blea's] testimony in making his decision.'" Id. (quoting Adams, 93 F.3d at 715).

### B. The ALJ's Findings

The ALJ accorded great weight to Dr. Weis's opinion because he reviewed most of the medical record from the relevant period, his "opinion is consistent with the mild to moderate abnormalities seen of objective imaging," with Plaintiff's normal gait, and with her "only mild to moderate difficulties performing orthopedic maneuvers." (R. 17). He accorded "no special significance" to the opinion of Plaintiff's mother because it was consistent with and cumulative of Plaintiff's allegations, and he discounted it "for the same reasons [he found Plaintiff's] statements inconsistent with the evidence." Id. He accorded no weight to Dr. Reed's opinion because it was issued well before the alleged onset of disability. Id. The ALJ accorded little weight to Dr. Fisher's opinion because it was "inconsistent with the minimal clinical signs and findings contained in [her] treatment notes," and because Plaintiff's dental pain is not a severe impairment. Id. He concluded:

> In sum, the above physical residual functional capacity assessment is supported by the mild to moderate abnormalities shown on objective imaging. The minimal clinical signs and findings, including a normal gait, limited range of motion, tenderness, and mild to moderate difficulty performing orthopedic maneuvers, also support the above residual functional capacity. Finally, the claimant's activities of daily living, including the ability to perform basic household chores, shop, and drive, also support the above residual functional capacity assessment.

(R. 17).

He then addressed Plaintiff's mental impairments. He noted that although Dr. Fisher "prescribed Adderall for ADHD, as well as Xanax and Effexor, [Plaintiff] has no recent history of formal outpatient mental health treatment …, and she has no history of inpatient psychiatric treatment." (R. 17). The ALJ accorded great weight to Dr. McRoberts opinion because it was generally consistent with the medical records and reports. Id. at 18. He accorded significant weight to Dr. Schemmel's opinion "because it is consistent with the clinical signs and findings, as well as the claimant's ability to manage finances, bake and drive." Id. However, he found Plaintiff's social functioning more limited than did Dr. Schemmel because of her abnormal affect. Id.

The ALJ recognized the opinion of Plaintiff's former supervisor that Plaintiff "had some, but not great, difficulty accepting instructions and reasonable criticism as well as cooperating with coworkers," that she was terminated for tardiness, and that she had some problems with prescription drugs. Id. at 18-19. But he gave this opinion little weight because although it is "helpful in understanding why she left that employment, [it] is less helpful in determining how her medically determinable impairments affect function." Id. at 19.

The ALJ concluded that his mental RFC assessing the abilities "to understand, carry out, and remember simple, routine, and repetitive tasks involving only simple, work-related decisions with few, if any, workplace changes with no fast-moving assembly line-type work [and to] occasionally interact with the public," id. at 14, is supported by the clinical signs and findings, and further supported by Plaintiff's daily activities of managing her finances, shopping, driving, and performing household chores,

which suggest mental abilities in understanding and memory, and concentration and persistence.  Id. at 19.

**C.    Analyses**

Plaintiff argues that it was error to discount her mother's opinion as merely cumulative to Plaintiff's allegations of symptoms and to discredit it for the same reasons the ALJ discredited Plaintiff's statements.  (Pl. Br. 17-18) (citing Nowling v. Colvin, No. 14-2170, 2016 WL 690821, at *9 (8th Cir. Feb. 22, 2016).[2]  The court cautions counsel on relying on non-binding Eighth Circuit precedent before this court, especially when there is Tenth Circuit law available as cited above.  Blea, 466 F.3d at 914-15; Adams, 93 F.3d 712, 715.  Nevertheless, it appears from Nowling that Eighth Circuit law is at least similar to the law in this Circuit.  813 F.3d at 1121 (In general an ALJ's failure to address a third-party opinion expressly "need not lead our court to reverse an ALJ's otherwise-supported decision.") (citing Buckner v. Astrue, 646 F.3d 549, 560 (8th Cir. 2011)).

As noted, the court in Nowling recognized the general rule but nonetheless remanded because "[t]he failure to consider Dawn Nowling's [(the plaintiff's sister's)] testimony and the misstatement of the record in this regard demonstrates a failure to properly analyze the effects of a structured setting as required by the regulations."  Id.  In Nowling, the ALJ did not mention Dawn Nowling's opinion at all, and it was the Commissioner who argued on appeal that the error was harmless because the opinion was

---

[2] The court is unsure why Plaintiff cited Nowling, a published opinion of the Eighth Circuit, as an unpublished opinion, but the court will cite to its appearance in the Federal Reporter, 3d Series.  813 F.3d 1110 (8th Cir. 2016).

cumulative--"the same evidence that discredits [the plaintiff's] testimony also discredits Dawn Nowling's testimony." Id. at 1122. The court found however, that "even without taking into account the peculiarities of a somatoform disorder, Dawn Nowling's testimony is neither redundant with [the plaintiff's] testimony, nor is it discredited by the same evidence that purportedly discredits [the plaintiff's] testimony." Id., 813 F.3d at 1122. For that reason, because the ALJ found the plaintiff had a conversion disorder, and because the ALJ erred in weighing the medical source opinions, the court determined it could not "find the failure to address Dawn Nowling's testimony harmless nor characterize it merely as an 'arguable deficiency in opinion-writing technique.'" Id. (quoting Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992)).

Despite that Nowling is not precedent controlling in this Circuit, this case may also be distinguished from it. The ALJ here considered and discussed Plaintiff's mother's opinions in his decision. (R. 17). There is no finding of a somatoform disorder here. This court has not found other errors requiring remand. And, perhaps most importantly, here the same evidence that discredits Plaintiff's allegations also discredits her mother's opinions. The mild to moderate objective imaging of the lumbar and cervical spine, the clinical signs and findings, and the lack of intensive medical treatment are inconsistent with Plaintiff's mother's opinion of disabling symptoms. Plaintiff's conservative treatment history, daily activities, and ability to live alone every other week is inconsistent with total physical disability. Plaintiff's lack of outpatient mental health treatment, no history of inpatient psychiatric treatment, and conservative mental health treatment history is inconsistent with a disabling mental impairment. Plaintiff's daily

activities which require mental functioning and her report to Dr. Schemmel that she has no mental limitations in her ability to perform basic daily activities are inconsistent with her mother's opinion of disability. Moreover, here the ALJ considered the opinion of Plaintiff's mother, as required by the law of the Tenth Circuit and Plaintiff has not demonstrated specific error in that consideration.

Plaintiff also argues that, contrary to the ALJ's finding (that the former supervisor's opinion is less helpful in assessing how Plaintiff's impairments affect her functioning), the observations that "she was not able to complete tasks, fell asleep on the job, and began showing up late to work are the most helpful in assessing Plaintiff's ability to function in a work setting." (Pl. Br. 21). But, the supervisor did not opine that Plaintiff was <u>not able</u> to complete tasks, rather that she <u>did not</u> complete tasks, fell asleep on the job, and began showing up late to work. As the ALJ noted, such information is less helpful in assessing Plaintiff's <u>functional</u> limitations. The ALJ considered this opinion in accordance with Tenth Circuit law. More is not required.

Regarding the Mental RFC assessed, Plaintiff notes that the ALJ found she had moderate difficulties maintaining social functioning (Pl. Br. 21) (citing R. 13) and limited her to occasional interaction with the public. <u>Id.</u> at 22 (citing R. 14). She argues that the ALJ should have limited her ability to interact with supervisors or co-workers also because the record indicates she had difficulty accepting instructions and criticism, and she had difficulty needing only an ordinary amount of supervision and attention. <u>Id.</u> (citing R. 216-18).

Plaintiff's argument fails for several reasons. First, the record evidence is not so straightforward as Plaintiff suggests. To be sure, the former supervisor indicated Plaintiff "had some difficulty" with accepting instructions and reasonable criticism, but she also provided a narrative, explaining that response. She explained, "Some days [Plaintiff] would cry if you tried to talk to her, others were fine. I felt some of this came from the fact she knew her job was in jeopardy." (R. 216). This explanation suggests the supervisor's opinion that Plaintiff's difficulty in this regard was either a choice or a product of circumstances rather than a functional limitation. As to needing only an ordinary amount of supervision and attention, the supervisor explained: "In the beginning yes, and for certain tasks." (R. 218). In context, and considering the supervisor's entire statement, this also suggests that this is not a functional limitation, but is a breakdown in the employment relationship. Second, even if the supervisor's statements support greater limitations in social functioning, the court found above that the ALJ properly discounted the supervisor's statement. Finally, as the Commissioner points out, the state agency psychologist, Dr. McRoberts, reviewed the record including the former supervisor's statement, and opined that Plaintiff "would be limited to jobs requiring infrequent interaction with the general public." (R. 86). This is record evidence supporting the ALJ's mental RFC assessment, and Plaintiff did not argue error in the ALJ's determination to give great weight to Dr. McRoberts's opinion.

Plaintiff's argument that the ALJ erred in discounting Dr. Fisher's opinion and in relying on Dr. Weis's opinion is also without merit. She argues that the ALJ did not identify the inconsistencies in Dr. Fisher's opinion, but the ALJ expressly stated that he

discounted Dr. Fisher's opinion because it was "inconsistent with <u>the minimal clinical signs and findings contained in [her] treatment notes.</u>" (R. 17) (emphasis added). She argues that it was error to discount the opinion on the basis that Plaintiff's dental condition is not severe because "[t]he fact Plaintiff still managed to eat and not lose weight is not a requirement of a severe dental impairment." (Pl. Br. 23). Plaintiff is correct that ability to eat and no weight loss do not preclude finding severe dental impairment. But, a severe impairment requires more than a minimal effect on the ability to perform basic work activities. <u>Williams</u>, 844 F.2d at 751. The ability to eat and no weight loss do suggest at least that Plaintiff's dental impairment does not have more than a minimal effect on her ability to perform basic work activities, and Plaintiff does not point to some basic work activity that is affected more than minimally by her dental impairment. Plaintiff asserts that the "ALJ addressed none of" the regulatory factors for weighing medical opinions. (Pl. Br. 24) (citing 20 C.F.R. §§ 404.1527, 416.927). This assertion is demonstrably false on its face. Plaintiff acknowledges that 'consistency" is one of the regulatory factors, <u>id.</u>, and as noted above, the ALJ found that Dr. Fisher's opinion was "<u>inconsistent</u> with the minimal clinical signs and findings contained in [her] treatment notes." (R. 17) (emphasis added).

Plaintiff's argument that Dr. Weis's opinion should not have been relied upon because it "was based solely on Plaintiff's lumbar changes and not on her 'severe' cervical and thoracic impairments," is likewise without merit. (Pl. Br. 24) (citing R. 95-96). In explaining his RFC opinion, Dr. Weis specifically cited a December 6, 2011 MRI

of the cervical spine (R. 96), and imaging of the thoracic spine and cervical spine performed on December 4, 2014. (R. 97).

## V.    Step Five

Plaintiff argues that the Commissioner failed to sustain her step five burden to show that there are a significant number of jobs in the economy within the RFC assessed. This is so, in Plaintiff's view because the VE testified inconsistently with information in the DOT and the ALJ did not resolve the inconsistencies--requiring remand for a resolution. The Commissioner argues that there is no conflict between the RFC assessed and the DOT requirements of the jobs of office helper or shipping weigher. She argues that in any case, Plaintiff does not allege inconsistency between the RFC and the DOT requirements of the job of a photocopy machine operator, that job has 20,000 positions in the national economy, and by itself that constitutes a significant number of jobs in the economy available to Plaintiff.

Here, the ALJ, based on the VE testimony, concluded that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," represented by "representative occupations such as: office helper (DOT# 239.567-010) a light, unskilled occupation with 41,000 jobs in the national economy; shipping weigher (DOT# 222.387-074) a light, unskilled occupation with 31,000 jobs in the national economy; and photocopy machine operator (DOT # 207.685-014) a light, unskilled occupation with 20,000 jobs in the national economy." (R. 20).

As Plaintiff suggests, the ALJ bears the burden at step five to show that there are jobs in the regional or national economies that Plaintiff can perform with the limitations

the ALJ assessed. <u>Haddock</u>, 196 F.3d at 1088. In SSR 00-4p, the Commissioner placed

two duties on the ALJ. First, the ALJ must "identify and obtain a reasonable explanation

for any conflicts between occupational evidence provided by VEs, ... and information in

the Dictionary of Occupational Titles (DOT), including its companion publication, the

Selected Characteristics of Occupations Defined in the Revised Dictionary of

Occupational Titles (SCO)." West's Soc. Sec. Rep. Serv., Rulings, 242 (Supp. 2018).

Second, the ALJ was given the duty to "[e]xplain in the determination or decision how

any conflict that has been identified was resolved." <u>Id.</u> SSR 00-4p places the affirmative

responsibility on the ALJ to "[a]sk the VE ... if the evidence he or she has provided

conflicts with information provided in the DOT," and where VE "evidence appears to

conflict with the DOT, ... [to] obtain a reasonable explanation for the apparent conflict."

<u>Id.</u> at 246.

　　　　The court finds that if there is a conflict on this record, it is only with the job of

shipping weigher, and the remaining occupations include 61,000 jobs, representing a

significant number of jobs in the national economy. Plaintiff first argues that the ALJ

limited Plaintiff to repetitive work, that the jobs of office helper and shipping weigher are

not identified in the DOT as repetitive jobs, and therefore Plaintiff cannot perform those

jobs. The court disagrees. Plaintiff misunderstands the decision at issue. The ALJ did

not find Plaintiff is <u>limited to</u> repetitive <u>work</u>. Rather, he found that "[s]he <u>is able to</u>

understand, carry out, and remember simple, routine, and repetitive <u>tasks</u> involving only

simple, work-related decisions with few, if any, workplace changes with no fast-moving

assembly line-type <u>work</u>." (R. 14) (bolding omitted) (emphases added). The ALJ did not

find Plaintiff was limited to repetitive work, he affirmatively found that she is capable of understanding, carrying out, and remembering simple, routine, repetitive <u>tasks</u> which do not involve complex decisions in relatively stable workplaces to perform <u>work</u> which is not of a fast-moving assembly-line type. Thus, the ALJ's RFC distinguishes between work, which is made up of tasks (some of which may be repetitive), and the tasks themselves, which are the building blocks of which that work is composed.

The plain meaning of "task" supports this understanding. A task is defined as, among other definitions, "a piece of work assigned to or demanded of a person," or "any piece of work." <u>Webster's New World Dictionary of the American Language</u> 1456 (2d coll. ed. 1976). Moreover, the DOT confirms this understanding. The DOT explains the "Parts of the Occupational Definition," wherein the "Body of the Definition" contains the "Lead Statement," the "Task Element Statements," and "'May' Items." <u>Dict. of Occup. Titles</u>, (4th Ed., Rev. 1991), <u>available online</u> at <u>https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTPARTS.HTM</u>, <u>last visited</u> September 12, 2018. The DOT explains that the lead statement in the body of the definition follows the industry designation and alternate title (if any). <u>Id.</u> It provides an overview of the occupation, and is followed by a colon. <u>Id.</u> Thereafter appear the task element statements which "indicate the specific tasks the worker performs to accomplish the overall job purpose described in the lead statement." <u>Id.</u> The "may" items "describe duties required of workers in this occupation in some establishments but not in others. The word "May" does not indicate that a worker will sometimes perform this task but rather that some workers in different establishments generally perform one of the varied tasks listed." <u>Id.</u> Therefore, the task

element statements and the "may" items (if required by a particular establishment) contain the tasks required of a particular job.

That the job of photocopy machine operator involves "Performing REPETITIVE or short-cycle work," DICOT 207.685-014, 1991 WL 671745; whereas the jobs of shipping (and receiving) weigher, DICOT 222.387-074, 1991 WL 672108; and office helper, DICOT 239.567-010, 1991 WL 672232, do not; does not suggest error in the ALJ's decision or an inconsistency between the VE's testimony and the RFC assessed. While repetitive work no doubt contains repetitive tasks, work which is not classified as repetitive might also contain repetitive tasks, the VE testified that the jobs here contain repetitive tasks which are within Plaintiff's RFC as assessed by the ALJ, and Plaintiff has not shown otherwise. There is no error here.

Plaintiff's argument that "the ALJ limited Plaintiff to simple work" (Pl. Br. 14) suffers from the same misunderstanding. As quoted above, the ALJ found that Plaintiff is able to understand, carry out, and remember simple tasks, involving only simple decisions. (R. 14). Therefore, Plaintiff's argument that the job of a shipping weigher is a reasoning level 3 job, and in the Tenth Circuit such jobs are inconsistent with a limitation to simple work, misses the mark. Plaintiff has shown no error in this regard. Moreover, even to the extent that one might assume that reasoning level 3 exceeds the ability to perform simple tasks or simple decisions, thereby eliminating jobs as a shipping and receiving weigher, the VE testified and the ALJ found that the remaining representative jobs of office helper and photocopy machine operator comprise 61,000 jobs in the national economy. (R. 20, 68). In her Brief, the Commissioner argued that the

representative job of photocopy machine operator alone, comprising just 20,000 jobs in the national economy, is a significant number of jobs (Comm'r Br. 16), and Plaintiff did not argue otherwise. Thereby Plaintiff has waived the argument that the 61,000 representative jobs encompassed within both occupations--photocopy machine operator and office helper--do not represent a significant number of jobs in the national economy available to an individual such as Plaintiff. Plaintiff has shown no step five error, and no error in the final decision of the Commissioner.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated September 14, 2018 at Kansas City, Kansas.

s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**